IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| PATRICIA REYES,<br><br>Plaintiff,<br><br>v.<br><br>N.A.R. INC., and<br>OLSON ASSOCIATES, P.C.,<br><br>Defendants. | **MEMORANDUM DECISION<br>AND ORDER<br>DISMISSING PLAINTIFF'S CLAIMS**<br><br>Case No. 1:20-cv-00007<br><br>Howard C. Nielson, Jr.<br>United States District Judge<br><br>FOR PUBLICATION |

Plaintiff Patricia Reyes, on behalf of herself and a putative class of similarly situated individuals, sued Defendants N.A.R., Inc. ("N.A.R."), and Olson Associates, P.C., alleging that Defendants' attempts to collect a debt that Ms. Reyes owed for medical services violated the federal Fair Debt Collection Practices Act ("FDCPA") as well as various Utah statutes. The court grants Defendants' motion to dismiss Ms. Reyes's federal claims and declines to exercise supplemental jurisdiction over her state law claims.

I.

Ms. Reyes signed a consent and condition of services agreement prepared by Intermountain Healthcare ("IHC") in connection with receiving medical services. *See* Dkt. No. 2 ("Compl.") ¶¶ 37, 39; Dkt. No. 10 at 4 ¶ 6; Dkt. No. 10-1 at 4–5. Among other things, this agreement provided that Ms. Reyes would pay "all costs and attorney fees (if an attorney is used) that the Facility or an independent contractor incurs directly or indirectly if either refers [her] overdue bill for collection." Dkt. No. 10-1 at 4.

After Ms. Reyes failed to pay for the medical services, IHC assigned her debt to Defendant N.A.R. for collection. *See* Compl. ¶ 38; Dkt. No. 20 at 12 n.3; Dkt. No. 10 at 4 ¶ 7; Dkt. No. 10-1 at 3 ¶ 6. N.A.R., represented by Defendant Olson Associates, filed an action in state court for $393.17 that it claimed Ms. Reyes owed for the medical services. *See* Compl. ¶ 38; Dkt. No. 10-1 at 2–3. The claim for $393.17 included a collection charge equal to roughly 40 percent of the actual fee for the medical services. *See* Compl. ¶ 40; Dkt. No. 10-1 at 3. Shortly thereafter, Defendants emailed Ms. Reyes a settlement offer. *See* Compl. ¶ 41; Dkt. No. 10-2. The settlement offer included a proposed confession of judgment. *See* Compl. ¶¶ 41–42; Dkt. No. 10-2 at 4. Ms. Reyes struck out language relating to the proposed confession of judgment and returned the revised settlement agreement to Defendant Olson Associates. *See* Compl. ¶ 43; Dkt. No. 10-2 at 2, 4. Ultimately, the parties did not reach an agreement and Ms. Reyes never accepted the proposed confession of judgment. *See* Compl. ¶¶ 43–46; Dkt. No. 10 at 4 ¶ 11.

Ms. Reyes then brought this suit. *See* Dkt. Nos. 1, 2. Defendants have moved to dismiss. *See* Dkt. No. 10.

## II.

Ms. Reyes alleges that Defendants violated the FDCPA by including a percentage-based collection charge in the amount they sought to recover in the state action, as well as by including a confession of judgment in the settlement agreement they proposed to Ms. Reyes. *See* Compl. ¶¶ 66–83; ¶¶ 105–122. Ms. Reyes alleges that these actions also violated various Utah statutes, including the Utah Communications Fraud Act and the Utah Consumer Credit Code. *See* Compl. ¶¶ 84–104; ¶¶ 123–132. For the following reasons, the court grants Defendants' motion to dismiss Ms. Reyes's FDCPA claims and declines to exercise supplemental jurisdiction over her state law claims.

## A.

The court first addresses Ms. Reyes's claim that Defendants violated the FDCPA by including a collection fee in the amount they sought to recover in the state court action. This claim fails because Defendants' actions are protected by Petition Clause immunity, which generally protects individuals and entities from liability for petitioning the government—including by bringing suit in court—for redress of grievances.

### 1.

Among its other guarantees, the First Amendment provides that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." U.S. CONST. amend. I. "The Supreme Court has 'recognized this right to petition as one of "the most precious of the liberties safeguarded by the Bill of Rights."'" *CSMN Investments, LLC v. Cordillera Metropolitan District*, 956 F.3d 1276, 1282 (10th Cir. 2020) (quoting *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 524–25 (2002), and *United Mine Workers of Am., Dist. 12 v. Illinois Bar Assn.*, 389 U.S. 217, 222 (1967)). As the Court has explained, "[t]he very idea of a government, republican in form, implies a right on the part of its citizens to . . . petition for a redress of grievances." *United States v. Cruikshank*, 92 U.S. 542, 552 (1875). This right is also "intimately connected, both in origin and in purpose, with the other First Amendment rights of free speech and free press." *United Mine Workers*, 389 U.S. at 222. These First Amendment rights, "though not identical, are inseparable." *Id.* (*quoting Thomas v. Collins*, 323 U.S. 516, 530 (1945)). "Immunity flows from this right, protecting those who seek redress through the courts from liability for petitioning activities." *CSMN Investments*, 956 F.3d at 1282.

The Supreme Court has frequently discussed the Petition Clause in the course of interpreting the reach of the Sherman Act, which prohibits agreements, combinations, or

conspiracies in restraint of trade, *see* 15 U.S.C. § 1, as well as monopolization and attempts, combinations, or conspiracies to monopolize, *see id*. § 2. In *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, the Court recognized "[t]he right of petition" as "one of the freedoms protected by the Bill of Rights." 365 U.S. 127, 138 (1961). Declining to "lightly impute to Congress an intent to invade these freedoms," *id*., the Court construed the Sherman Act to "not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly," *id.* at 136.

As the Court explained, reading the Act to apply to the "mere solicitation of governmental action with respect to the passage and enforcement of laws" "would raise important constitutional questions." *Id*. at 138. "Because of the view" it took "of the proper construction of the Sherman Act," the Court found it "unnecessary" squarely to decide whether "the activities complained of were constitutionally protected under the First Amendment," however. *Id*. at 132 n.6.

In *United Mine Workers of America v. Pennington*, the Supreme Court confirmed that "[j]oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition," and it made clear that "[s]uch conduct is not illegal" even when "part of a broader scheme itself violative of the Sherman Act." 381 U.S. 657, 670 (1965). The construction of the Sherman Act first set forth by the Court in these two cases has come to be called the *Noerr-Pennington* doctrine.

In *California Motor Transport Co. v. Trucking Unlimited*, the Court extended this doctrine, holding that "[t]he same philosophy governs the approach of citizens or groups of them to administrative agencies (which are both creatures of the legislature, and arms of the executive)

and to courts, the third branch of Government." 404 U.S. 508, 510 (1972). In reaching this conclusion, the Court relied on the propositions that "[c]ertainly the right to petition extends to all departments of the Government" and that "[t]he right of access to the courts is indeed but one aspect of the right of petition." *Id.*; *see also* at 513 ("Petitioners, of course, have the right of access to the agencies and courts to be heard on applications sought by competitive highway carriers. That right, as indicated, is part of the right of petition protected by the First Amendment."). As the Court explained, "it would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests vis-à-vis their competitors" *Id.* at 510–511.

The Supreme Court has taken essentially the same approach in construing the National Labor Relations Act ("NLRA"). Rejecting the position of the National Labor Relations Board, the Court held in *Bill Johnson's Restaurants, Inc. v. NLRB* that "[t]he filing and prosecution of a well-founded lawsuit may not be enjoined as an unfair labor practice, even if it would not have been commenced but for the plaintiff's desire to retaliate against the defendant for exercising rights protected by the Act." 461 U.S. 731, 743 (1983). Noting its recognition in *California Motor* "that the right of access to the courts is an aspect of the First Amendment right to petition the government for redress of grievances," the Court determined that it "should be sensitive to these First Amendment values in construing the NLRA in the present context." *Id*. at 741. The Court explained that "were only the literal language of [the NLRA] considered, we would be inclined to uphold the Board, because its present construction of the statute is not irrational." *Id*. at 742. But after "[c]onsidering the First Amendment right of access to the courts" and the

5

federalism implications of enjoining a state court lawsuit, the Court "conclude[d] that the Board's interpretation of the Act is untenable." *Id*. at 742–43.

In *BE & K Construction Co. v. NLRB*, the Court similarly held that the NLRA did not authorize monetary sanctions against an employer for filing a reasonably based lawsuit, even if that lawsuit proved unsuccessful and even if it was filed for a retaliatory purpose. *See* 536 U.S. 516, 536 (2002). The Court began its analysis by quoting the text of the Petition Clause and emphasizing that it had previously both "recognized this right to petition as one of 'the most precious of the liberties safeguarded by the Bill of Rights,'" and "explained that the right is implied by '[t]he very idea of a government, republican in form.'" *Id*. at 524–25 (quoting *United Mine Workers*, 389 U.S. at 222, and *Cruikshank*, 92 U.S. at 552) (alteration in *BE & K Constr. Co.*). The Court explained that whether "the class of reasonably based but unsuccessful lawsuits . . . falls outside the scope of the First Amendment's Petition Clause at the least presents a difficult constitutional question." *Id.* at 531–32. The Court ultimately found it unnecessary to resolve this question, however: "[b]ecause there is nothing in the statutory text indicating that [the NLRA] must be read to reach all reasonably based but unsuccessful suits filed with a retaliatory purpose, we decline to do so." *Id*. at 536.

The Tenth Circuit has held that the same principles apply generally and are not limited to the antitrust or labor law context. *See CSMN Investments*, 956 F.3d at 1283. Outside the antitrust context, the Tenth Circuit refers to these principles as "Petition Clause immunity, reserving the name, *Noerr-Pennington*, for antitrust cases." *Id.* In so doing, the Tenth Circuit also made clear what the Supreme Court cases strongly imply—that the immunity applies not merely as a rule of statutory construction, but as a matter of constitutional law.

In *CSMN*, a developer seeking to open an addiction-treatment center brought a federal lawsuit against the municipal district and property owners association that opposed its plans. *See id*. at 1281. The developer argued that its opponents' attempt to stop the development through state court litigation violated the Americans with Disabilities Act and the Fair Housing Act. *See id*. It also asserted a claim under 42 U.S.C. § 1983 for equal protection and due process violations. *See id*. In rejecting the developer's claims, the Tenth Circuit held that "[t]he First Amendment guarantees the people a right 'to petition the Government for a redress of grievances.' The right immunizes litigants from liability for their petitioning activities, unless the petitioning is a sham." *Id.* at 1278.

There can be no doubt that this was a constitutional holding. Not only did the court cast this holding in explicitly constitutional language, but unlike the Supreme Court's decisions interpreting the Sherman Act and the NLRA, the Tenth Circuit made no effort to construe—or even to discuss—the relevant text of the Americans with Disabilities Act, the Fair Housing Act, or Section 1983. In addition, the court justified its decision to "review de novo the proper test for determining what constitutes sham petitioning" on the ground that this issue "presents a question of constitutional law." *Id*. at 1284. And in explaining its name for the immunity outside the antitrust context, the Tenth Circuit stated that "it is more appropriate to refer to immunity as *Noerr-Pennington* immunity only when applied to antitrust claims. In all other contexts, . . . such immunity derives from the [Petition Clause]." *Id*. at 1283 (internal quotations omitted; ellipsis and alterations in *CSMN*).

**2.**

To be sure, Ms. Reyes is correct that the Supreme Court has held that the FDCPA "appl[ies] to lawyers engaged in litigation." *Heintz v. Jenkins*, 514 U.S. 291, 294 (1995). And

while in *Heintz* the Court suggested that the statutory defense the FDCPA provides for bona fide errors might apply to mistakes of law and thus protect lawyers from liability for litigation activity they reasonably believed did not violate the FDCPA, *see id.* at 296, the Court subsequently rejected this proposition in *Jerman v. Carlisle, McNellie, Rini, Kramer, & Ulrich LPA*. There it held that "the bona fide error defense in §1692k(c) does not apply to a violation of the FDCPA resulting from a debt collector's incorrect interpretation of the requirements of that statute." 559 U.S. 573, 604–05 (2010).

Based on these holdings, Ms. Reyes argues—and some courts have suggested—that the Petition Clause does not apply to FDCPA claims. In *Hartman v. Great Seneca Financial Corp.*, for example, the Sixth Circuit stated that "the Supreme Court's conclusion in *Heintz v. Jenkins* . . . indicates that the FDCPA is intended to burden debt-collectors even when they are engaged in litigation" and considered this an indication "that the First Amendment and any common-law privilege that applied to statements made during judicial proceedings do not foreclose the current [FDCPA] actions." 569 F.3d 606, 615 (6th Cir. 2009).

In a later case, the Sixth Circuit rejected the defendants' "argument that the *Noerr-Pennington* doctrine limits the application of the FDCPA to their activities" as "inapposite." *Wise v. Zwicker & Associates, P.C.*, 780 F.3d 710, 719 n.5 (6th Cir. 2015). Said the court:

> The FDCPA specifically includes lawyers and litigation activities within its purview. The defendants present no cases in which a court has applied the *Noerr-Pennington* doctrine to FDCPA claims. In fact, this circuit has already rejected *Noerr-Pennington* protection for false statements in a debt-collector's complaint, recognizing that the Petition Clause does not protect "sham petitions, baseless litigation, or petitions contain information intentional and reckless falsehoods."

*Id.* (internal citation omitted; quoting *Hartman*, 569 F.3d at 616).

This court disagrees. First, a necessary premise of this argument—and the reasoning in these cases—is that Petition Clause immunity applies only as a matter of statutory construction.

8

But as discussed, the Supreme Court's cases strongly imply—and the Tenth Circuit has squarely held—that this immunity applies as a matter of constitutional right. It follows that it cannot be overridden by Congress—whether by the FDCPA or any other statute.

Nor do the Supreme Court cases hold or even suggest that the FDCPA was intended to override Petition Clause immunity. Neither *Heintz* nor *Jerman* discussed the immunity, let alone held that it does not apply to an FDCPA claim. Indeed, *Heintz* did not address the First Amendment at all. And although the dissent in *Jerman* raised a different First Amendment concern relating to lawyer's speech, *see* 599 U.S. at 623 (Kennedy, J., dissenting) (discussing *Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001)), the majority declined to consider this argument because it was not properly presented, *see id.* at 604 n.21.

Additionally, because Petition Clause immunity is not absolute—it does not protect sham petitions, as the Tenth Circuit held in *CSMN*—it is foreclosed neither by the holding of *Heintz*, which rejected only the categorical proposition that the act never applies to lawyers in litigation, nor the holding of *Jerman*, which held only that the statutory bona fide error defense does not apply to legal errors. Indeed, although in two cases the Sixth Circuit suggested that the immunity does not apply to FDCPA cases, neither case is a square holding. Rather, in both cases the court made clear that even if the immunity extended to the FDCPA context, it would not apply to the facts presented. In *Hartman*, the defendant was accused of intentional misrepresentation in its litigation filings. After noting that the "Petition Clause protects legitimate petitioning but not sham petitions, baseless litigation, or petitions containing intentional and reckless falsehoods," the Sixth Circuit accordingly held that "even assuming that there is some First Amendment protection relevant to the FDCPA, such an allegedly false statement is not immunized by the Petition Clause." *Hartman*, 569 F.3d at 616. And in *Wise*, the Sixth Circuit concluded that

9

"[e]ven if such protection existed, it would not protect these defendants because Wise pled that they demanded attorney's fees in contexts outside the litigation." *Wise*, 780 F.3d at 719 n.5.

Nor is Petition Clause immunity inconsistent with the reasoning or language of *Heintz* or *Jerman*. Indeed, in *Heintz* the Court specifically recognized "the statute's apparent objective of preserving creditors' judicial remedies," 514 U.S. at 296—"an objective," the Eighth Circuit has recognized, that is "consistent with the principle 'that the right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances,'" *Hemmingsen v. Messerli & Kramer, P.A.*, 674 F.3d 814, 819 (8th Cir. 2012) (quoting *Bill Johnson's Restaurants*, 461 U.S. at 741). The Court in *Heintz* also made clear that although it did not "authoritatively interpret the Act's conduct-regulating provisions," it believed these provisions could likely be read to contain "some [] additional, implicit, exception" consistent with the objective of preserving creditors' judicial remedies. *Heintz*, 514 U.S. at 296–97. And in *Jerman*, after repeating the observation from *Heintz* that "it would be 'odd' if the Act interfered in this way with 'an ordinary debt-collecting lawsuit,'" the Court stated that "[a]s in *Heintz*, we need not authoritatively interpret the Act's conduct-regulating provisions to observe that those provisions should not be assumed to compel absurd results when applied to debt collecting attorneys." *Jerman*, 559 U.S. at 599–600.

For all of these reasons, the court concludes that the FDCPA does not (and cannot) eliminate Petition Clause immunity.

### 3.

The court's conclusion that Petition Clause immunity applies in the context of FDCPA claims does not end the court's inquiry, however, for as noted, that immunity does not protect sham petitions. Just as the Tenth Circuit held that the principles of Petition Clause immunity

10

reflected in the *Noerr-Pennington* doctrine apply outside the antitrust context, it also held that the sham-petition exception to that immunity, as outlined by *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993), also applies outside the antitrust context. *See CSMN Investments,* 956 F.3d at 1283. To determine whether a petition is a sham-petition, "*Professional Real Estate* provides a two-step approach: (1) is the petitioning objectively reasonable? (2) and only if not, what is the subjective intent behind the petitioning?" *Id.* at 1283–84.

### 4.

The court has little difficulty concluding that a lawsuit to recover a debt is a petition for redress of grievances for purposes of Petition Clause immunity. It follows that Defendants cannot be held liable under the FDCPA for seeking to recover a collection fee in the state court litigation unless their request to recover this fee constituted a sham petition.

As relevant here, the FDCPA prohibits debt collectors from collecting "any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1). It also prohibits debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." *Id*. § 1692e.

Ms. Reyes's primary argument is that Defendants' attempts to recover the collection fee in the state court litigation violated these provisions because Defendants are not permitted to recover a collection fee under Utah law. Specifically, she argues that the IHC Agreement did not satisfy the requirements imposed by Utah statute for requiring a debtor to pay a collection fee.

The relevant Utah statute provides as follows:

> (a) A creditor may require a debtor to pay a collection fee in addition to any other amount owed to the creditor for a debt if:

11

(i) imposing a collection fee on the debtor or in relation to the debt is not prohibited or otherwise restricted by another federal or state law;

(ii) the creditor contracts with a third party debt collection agency or licensed attorney to collect the debt;

(iii) the third party debt collection agency with which the creditor contracts is registered under this title;

(iv) there is a written agreement between the creditor and debtor that:

(A) creates the debt; and

(B) provides for the imposition of a collection fee in accordance with this section; and

(v) the obligation to pay the collection fee is imposed at the time of assignment of the debt to a third party debt collection agency or licensed attorney in accordance with an agreement described in Subsection (2)(a)(iv).

(b) The creditor shall establish the amount of the collection fee imposed under this Subsection (2), except that the amount may not exceed the lesser of:

(i) the actual amount a creditor is required to pay a third party debt collection agency or licensed attorney, regardless of whether that amount is a specific dollar amount or a percentage of the principal amount owed to the creditor for a debt; or

(ii) 40% of the principal amount owed to the creditor for a debt.

(c) An obligation to pay a collection fee imposed under this Subsection (2) is in addition to any obligation to pay attorney fees that may otherwise exist.

Utah Code Ann. §12-1-11(2).

Ms. Reyes argues that because the IHC Agreement does not specify the amount of the collection fee, the creditor failed to "establish the amount of the collection fee" as required by Utah Code Ann. §12-1-11(2)(b). Dkt. No. 20 at 5. Ms. Reyes, however, cites no Utah authority interpreting the statute to require that the amount of the collection fee be specified in the contract between the creditor and debtor, and the court has not found any authority so holding.

Nor does the text of the statute appear to impose such a requirement. To the contrary, the requirement that the creditor establish the amount of the collection fee is not included in Section 12-1-11(2)(a)(iv), which specifies what requirements the "written agreement between the creditor and debtor" must satisfy. In addition, reading the statute to require that the amount of the collection fee be specified in the contract between the creditor and debtor would be in tension with other provisions of the statute that bar recovery of a collection fee that exceeds "the actual amount a creditor is required to pay a third party debt collection agency or licensed attorney" and require that "the obligation to pay the collection fee" be "imposed at the time of assignment of the debt to a third party debt collection agency or licensed attorney." *Id*. § 12-1-11(2)(a)(v), (b)(i). These provisions appear to contemplate that a creditor's ability to recover a collection fee, as well as the amount of that fee, is determined in part by a subsequent assignment agreement between the creditor and a debt collector—not simply by the agreement between the debtor and the creditor.

The court has no doubt that the statute requires a creditor to establish the amount of the collection fee before it can recover that fee from the debtor. But reading the provision requiring a creditor to "establish the amount of the collection fee" in conjunction with the other provisions of the statute, it appears that this provision is most naturally read to permit the creditor to establish the amount of the collection fee in connection with its collection attempts (for example, by requiring that the creditor establish the amount of the fee in connection with a lawsuit to recover the collection fee and the underlying debt), not to require that the amount of the collection fee be specified in the underlying agreement between the creditor and the debtor.

The court need not definitively decide whether this reading of the Utah statute is correct, however. Because the Petition Clause protects Defendants from liability for seeking redress

through the courts unless their lawsuit constitutes a sham petition, it is enough to conclude that this reading is at least objectively reasonable. And the court does so conclude.

To be sure, the Utah statute does require that the "written agreement between the creditor and debtor . . . provide[] for the imposition of the collection fee in accordance with this section." *Id*. § 12-1-11(2)(a)(iv). Here, the IHC Agreement requires that Ms. Reyes pay "all costs and attorney fees (if an attorney is used) that the Facility or independent contractor incurs directly or indirectly if either refers [the] overdue bill for collection." Dkt. No. 10-1 at 4. It is not obvious whether this contractual language suffices to "provide[] for the imposition of the collection fee" within the meaning of the statute.

On the one hand, the agreement does not expressly mention a collection fee. On the other hand, the statute requires only that the agreement "provid[e] for the imposition of the collection fee"—not that it do so "expressly." *Cf.* 15 U.S. Code § 1692f(1) (prohibiting collection of "any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is *expressly* authorized by the agreement creating the debt or permitted by law") (emphasis added). In addition, because a creditor that refers a debt for collection generally must pay the debt collector a collection fee, there can be little doubt that a collection fee is a "cost" that the creditor "incurs directly or indirectly" by referring the "overdue bill for collection." The same is also true of attorneys' fees, however, but these are provided for separately in the agreement, which makes Ms. Reyes liable for "costs *and* attorneys fees" incurred directly or indirectly—not, for example "costs, *including* attorneys' fees." It thus could be argued that the parties' specific provision for attorneys' fees implies that if they also intended to provide for the recovery of collection fees they would have said so expressly.

14

Ms. Reyes has not cited, and the court is unaware of, any authoritative decisions addressing whether the Utah statute requires that the agreement between the debtor and the creditor expressly mention collection fees. And cases addressing Section 1692f(1) of the FDCPA—which, as noted, prohibits debt collectors from seeking to recover collection fees unless they are "*expressly* authorized by the agreement or permitted by law"—have reached conflicting results.

In *Bernal v. NRA Group, LLC*, the Seventh Circuit held that an agreement providing that "you will be billed for any amounts that are due and owing plus any costs (including reasonable attorney's fees) incurred by us in attempting to collect amounts due or otherwise enforcing this agreement" expressly authorized the recovery of a percentage-based collection fee, because it "explicitly allows for '*any* costs'" and because the collection fee was a cost to the original creditor. 930 F.3d 891, 892–93 (7th Cir. 2019) (emphasis in original).[1]

In *Bradley v. Franklin Collection Service, Inc.*, by contrast, the Eleventh Circuit held that an agreement requiring a debtor to "pay all costs of collection, including a reasonable attorney's fee" did not authorize the recovery of a percentage-based collection fee. 739 F.3d 606, 609–610 (11th Cir. 2014). It reasoned that such a fee does "not correlate to the costs of collection" because it is "really liquidated damages rather than the actual cost of collection." *Id*. at 609. The court held that a different agreement requiring the debtor "to pay all costs of collection including reasonable interest, reasonable attorney's fees (even if suit is filed) and reasonable collection agency fees" did authorize recovery of a percentage-based collection fee, however. *Id.* at 608–10; *see also id.* at 608 n.4.

---

[1] To be sure, the agreement in *Bernal* provided for "any costs (*including* reasonable attorney's fees)"—not, as here, "costs *and* attorneys fees." *See supra* at 14.

15

In this case, however, the court need not decide whether the IHC Agreement provided "for the imposition of a collection fee in accordance with this section" for purposes of Utah Code. Ann. § 12-1-11(2)(a)(iv)(B) or whether that statute requires that the agreement expressly mention "collection fees." Because Defendants are protected by Petition Clause immunity, it is sufficient to conclude that Defendants reasonably could have believed that the IHC Agreement satisfied the statutory requirement and thus that their request for collection fees was not a sham petition. In light of the considerations discussed, the court concludes that they reasonably could have so believed.

Ms. Reyes has not argued that any other requirements of the Utah statute were not satisfied here. And because Defendants could have reasonably believed that the statute did not require that the IHC Agreement specify the amount of the collection fee and that this Agreement's reference to costs incurred directly or indirectly by the creditor provided for the recovery of collection fees within the meaning of the Utah statute, the court concludes that Defendants could have reasonably believed that the recovery of collection fees was "permitted by law" within the meaning of 15 U.S.C. § 1692f(1). Additionally, because the text of Section 1692f(1) is disjunctive—allowing a debtor to recover collection fees if they are either "expressly authorized by the agreement creating the debt *or* permitted by law"—the court need not decide whether the collection fees sought by Defendants in this case were "expressly authorized" by the IHC Agreement. Finally, because Defendants' attempt to recover collection fees was objectively reasonable, the court cannot say that Defendants used "false, deceptive, or misleading representation" in seeking to recover these fees in the state court litigation. 15 U.S.C. § 1692e.

The court accordingly dismisses Ms. Reyes's claim that Defendants violated Section 1692f(1) and 1692e of the FDCPA by seeking to recover collection fees in the state court litigation.

**B.**

The court next turns to Ms. Reyes's claim that Defendants violated the FDCPA by including a confession of judgment in the proposed settlement agreement. Again, the FDCPA prohibits debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Ms. Reyes argues that Utah law prohibits confessions of judgment in circumstances such as those presented by the state lawsuit and that by including the proposed confession of judgment, Defendants falsely represented that the confession of judgment was lawful and thus violated Section 1692e.

The court is uncertain whether Petition Clause immunity extends to a settlement offer neither accepted by the party to whom it was presented nor approved by the court. *Compare Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 932–33, 938 (9th Cir. 2006) (holding that immunity extends to "prelitigation settlement demands"), *with Cardtoons, L.C. v. Major League Baseball Players Assn.*, 208 F.3d 885, 891. (10th Cir. 2000) (holding that immunity does not protect "prelitigation threats communicated solely between private parties"). The court need not decide this issue, however, because it concludes that Ms. Reyes has failed to establish that Utah law barred the confession of judgment at issue here.

Ms. Reyes bases her argument on a provision of the Utah Consumer Credit Code ("UCCC") that bars a "[a] creditor or its successor in interest" from "tak[ing] or receiv[ing] from a debtor an obligation that constitutes or contains . . . a confession of judgment." Utah Code Ann. § 70C-2-201. The UCCC defines a creditor as:

a party:

> (A) who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments, not including a down payment; and
>
> (B) to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract.

Utah Code Ann. § 70-1-302(3)(a)(i). It further states that "the provisions of this title apply to all credit offered or extended by a creditor to an individual person *primarily for personal, family, or household purposes*." *Id*. § 70C-1-201 (emphasis added). Finally, the UCCC provides that "[e]xcept as otherwise defined, all definitions or terms used in this title have the same meaning as when used in the federal Consumer Credit Protection Act, 15 U.S.C. Sections 1601 through 1677, as amended, and its implementing Regulation Z." *Id*. § 70C-1-301. This federal statute, in turn, establishes that the "[t]he adjective 'consumer,' used with reference to a credit transaction, characterizes the transaction as one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are *primarily for personal, family, or household purposes*." 15 U.S.C. § 1602 (emphasis added).

Ms. Reyes argues that the proposed settlement agreement would have constituted a new transaction, creating a new credit agreement between the parties. *See* Dkt. No. 20 at 13–16. But based on the most natural reading of the statutory definitions of "creditor" and "consumer," the court concludes that an installment plan for settling a legal claim is not credit extended "primarily for personal, family, or household purposes." Thus, if the court accepts Ms. Reyes's argument that the proposed settlement agreement would constitute a new transaction, the court would conclude that Defendants—who are debt collectors— do not extend "consumer credit" and thus are not "creditors" within the meaning of the UCCC. But if the proposed settlement agreement would not constitute a new transaction, then Defendants are not supplying credit at

18

all, but only collecting what was previously owed to another party—in which case they are still not creditors who supply consumer credit for purposes of the UCCC.[2]

Either way, Ms. Reyes's claim that the proposed confession of judgment violated the FDCPA because it violated UCCC fails and must be dismissed.

## C.

The Tenth Circuit has explained that "[w]hen all federal claims have been dismissed, the court may, and usually should, decline to exercise [supplemental] jurisdiction over any remaining state claims." *Smith v. City of Enid*, 149 F.3d 1151, 1156 (10th Cir. 1998); *see also* 28 U.S.C § 1367(c)(3). Because the court has determined that Ms. Reyes's federal claims must be dismissed for failure to state valid claims, it will follow this guidance and dismiss her state law claims without prejudice.[3]

**IT IS SO ORDERED.**

DATED this 29th day of June, 2021.

BY THE COURT:

_____

Howard C. Nielson, Jr.
United States District Judge

---

[2] To be sure, Section § 70C-2-201 applies to "successor[s] in interest" as well as "creditors." Ms. Reyes, however, has not argued that Defendants are liable as "successors of interest" under this provision, so the court will not address this potential argument. And although Ms. Reyes cited another Utah statute addressing confessions of judgment in her response to a different argument, *see* Dkt. No. 20 at 24–26 (citing Utah Code Ann. §13-11-4) the court finds that she has not properly presented any argument that Defendants violated this provision and thus violated the FDCPA.

[3] In light of the disposition of Ms. Reyes's claims, the court denies as moot Defendants' motion to certify the state law issues to the Utah Supreme Court, *see* Dkt. No. 25, as well as their motion for a stay pending certification, *see* Dkt. No. 26.